J-S35045-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| JOSEPH FRANCESCO BENT | : | |
| | : | |
| Appellant | : | No. 271 MDA 2024 |

Appeal from the PCRA Order Entered February 1, 2024
In the Court of Common Pleas of York County Criminal Division at No(s):
CP-67-CR-0002499-2018

BEFORE: PANELLA, P.J.E., MURRAY, J., and KING, J.

MEMORANDUM BY KING, J.:                    **FILED: DECEMBER 11, 2024**

Appellant, Joseph Francesco Bent, appeals *pro se* from the order entered in the York County Court of Common Pleas, which denied his first petition filed under the Post Conviction Relief Act ("PCRA"), at 42 Pa.C.S.A. §§ 9541-9546. We affirm in part, and vacate and remand in part.

In its opinion denying relief, the PCRA court set forth the relevant facts and procedural history of this case as follows:

> [Appellant] was found guilty of one count of Rape by Forcible Compulsion, one count of Involuntary Deviate Sexual Intercourse by Forcible Compulsion, one count of Sexual Assault, one count of Aggravated Indecent Assault, and one count of Indecent Assault following a three-day jury trial from March 11 through March 13, 2022, before the, now retired, Honorable Judge Craig T. Trebilcock[, during which Appellant had represented himself at trial]. [Appellant] was sentenced to an aggregate term of 14½ years to 29 years in a State Correctional Institution on June 22, 2020. A post-sentence motion requesting reconsideration of [Appellant's] sentence was filed on June 30, 2020, and was subsequently

granted in part (finding that count 3 merge[d] with count 2 for sentencing) and denied in part on August 19, 2020. Thereafter, a Notice of Appeal was filed by [Appellant] on September 17, 2020. In an Order dated November 9, 2020, the Superior Court ordered the trial court to conduct an on-the-record inquiry as to whether [Appellant] wished to proceed *pro se*. On December 4, 2020, following a ***Grazier***[1] hearing, Attorney Snyder was removed as appellate counsel for [Appellant] but was ordered to remain as stand-by counsel. On December 22, 2020, [Appellant] made a motion for bail pending appeal which was denied by Judge Trebilcock by Order dated January 11, 2021, due to the court's determination that [Appellant] remained a threat to society.

Judge Trebilcock then filed a Pa.R.A.P. 1925(a) [opinion] requesting that [Appellant's] claim be granted on the issue of an *ex post facto* probationary punishment and denied on all other grounds, on February 13, 2021. On June 22, 2021, the Superior Court affirmed [Appellant's] convictions but vacated his sentence in part due to the sentence constituting an illegal *ex post facto* violation. [Appellant] then filed a petition for allowance of appeal with the Supreme Court on August 13, 2021[, which he later withdrew before the Court ruled on it]. [Appellant] then filed a [PCRA petition] on September [9], 2021[, by virtue of the prisoner mailbox rule, which was docketed on September 14, 2021]. A PCRA hearing was scheduled for December 17, 2021, but was continued generally due to Defense Counsel's inability to amend the PCRA Petition.

On the record at the December 17th hearing, counsel for [Appellant], Attorney Charles Hobbs, placed on the record that [Appellant] had raised three claims in his PCRA petition, and that counsel had determined that two of the three claims were without merit. Attorney Hobbs then sought the advice of the court as to how to proceed with the case, as [Appellant] did not grant Attorney Hobbs permission to amend the petition to withdraw the meritless claims. Judge Trebilcock then asked [Appellant] if he wished to proceed on his claims at that hearing, which [Appellant] indicated he

---

[1] ***See Commonwealth v. Grazier***, 552 Pa. 9, 713 A.2d 81 (1998).

did. However, [Appellant] then objected to appearing via Zoom for his PCRA hearing, at which point the court discontinued the hearing and indicated that it would be rescheduled in the future before [a new jurist], as Judge Trebilcock was retiring in early January 2022.

Thereafter, on December 19, 2021, a *pro se* Motion to Amend his PCRA petition was docketed. A hearing was then scheduled for March 18, 2022. On January 27, 2022, [Appellant] filed an Amended Brief for Appellant's PCRA. On March 15, 2022, the Commonwealth filed a Motion to Dismiss [Appellant's PCRA petition] based on [Appellant's] refusal to allow PCRA Counsel to amend his PCRA Petition and his failure to conform to the requirements of the Pennsylvania Rules of Criminal Procedure. At the PCRA hearing on March 18, 2022, this [c]ourt granted the Commonwealth's motion to dismiss, and ordered [Appellant] to file an amended petition as it related to [a sentencing issue concerning calculation of Appellant's prior record score]. Additionally, this [c]ourt ordered that, within five days, Attorney Hobbs send a copy of any records as requested by [Appellant]. Attorney Hobbs filed a Notice of Compliance with Court Order on March 21, 2022, and his representation ended on that date.

[Appellant] thereafter filed an Amended PCRA petition on March 25, 2022; however, this Amended Petition was mistakenly docketed as Case Correspondence. On April 20, 2022, the Commonwealth filed a Renewed Motion to Dismiss [Appellant's PCRA petition] on the grounds that [Appellant] failed to file an Amended Petition within 30 days, as ordered by the court. Unfortunately, due to the clerical error with [Appellant's] petition being docketed as Case Correspondence, this [c]ourt granted the Commonwealth's Motion to Dismiss on April 25, 2022. [Appellant's] Amended PCRA Petition was then properly docketed as an Amended Petition on May 9, 2022. Additionally, on May 9, 2022, [Appellant] filed a Motion to Reconsider the [c]ourt's Order granting the Commonwealth's Motion to Dismiss. This [c]ourt then dismissed [Appellant's] petition and denied [Appellant's] Motion for Reconsideration on May 13, 2022.

On September 1, 2022, [Appellant] filed a Notice of Appeal with the Superior Court. On September 20, 2022, the

Superior Court indicated to [Appellant] that the Notice of Appeal was improperly filed and should have been filed with the [PCRA] court. Thereafter, on October 17, 2022, [Appellant] filed a renewed Notice of Appeal with this [c]ourt. This [c]ourt then filed a Pa.R.A.P. 1925(a) Opinion on November 30, 2022. We note that this 1925(a) Opinion was written without a 1925(b) statement from [Appellant], and this this was done in error on the part of this [c]ourt. On August 9, 2023, the Superior Court entered an Order requiring this [c]ourt to rule on [Appellant's] Amended PCRA Petition of March 2022. The Superior Court then relinquished appellate jurisdiction. [*See Commonwealth v. Bent*, No. 1491 MDA 2022 (Pa.Super. filed Aug. 9, 2023) (unpublished memorandum)]. [Appellant] then filed a Motion for Bail on August 21, 2023, which this [c]ourt denied on August 29, 2023. [Appellant] then filed a Motion for Reconsideration of Bail on September 14, 2023, which this [c]ourt denied due to lack of pending appeal on October 2, 2023.

Due to [Appellant] raising Ineffective Assistance of Counsel as a claim in his initial PCRA Petition, this [c]ourt appointed PCRA counsel, Attorney Brandy Hoke, Esquire, to represent [Appellant] on October 3, 2023[, following the Superior Court's remand]. On October 29, 2023, Attorney Hoke filed a Motion to Withdraw as Counsel citing that she had attempted to contact [Appellant] regarding this matter and that [Appellant] indicated that he did not want counsel to represent him. This [c]ourt then scheduled a hearing on Attorney Hoke's motion to withdraw. A hearing was held on November 28, 2023, during which time 1) Attorney Hoke's motion to withdraw was granted, 2) it was ordered that [Appellant] would have 14 days to make any changes to the active PCRA petition, and 3) it was further ordered that the Commonwealth would have an additional 14 days to respond to the petition.

Thereafter, [Appellant] filed a Motion to Dismiss All Charges pursuant to Pa.R.Crim.P. 600 on December 1, 2023, and Amended PCRA on December 8, 2023, and a second Motion to Dismiss All Charges on December 19, 2023. Additionally, on December 6, 2023, Attorney Hoke filed a Motion for Payment of Counsel Fees, which this [c]ourt granted on December 11, 2023; in response, [Appellant] filed Case

> Correspondence which this [c]ourt reads as a "Motion of Awareness," in which [Appellant] requested clarification as to whom Attorney Hoke represented.

(PCRA Court Opinion, filed 2/1/24, at 1-6) (internal citations omitted). *See also id.* at 7-16 (providing detailed recitation of evidence adduced at trial). The court denied PCRA relief on February 1, 2024.[2] Appellant timely filed a notice of appeal on February 21, 2024. That same day, the court ordered Appellant to file a concise statement of errors complained of on appeal per Pa.R.A.P. 1925(b), and Appellant complied.

On appeal, Appellant raises ten issues for our review, alleging: (1) the trial judge should have recused; (2) a violation of Appellant's rights under the Confrontation Clause; (3) a violation of Appellant's right to counsel; (4) ineffective assistance of counsel; (5) after-discovered evidence; (6) judicial misconduct; (7) PCRA court error; (8) violations of Appellant's 5th, 6th, 8th, and 14th Amendment rights; (9) denial of Appellant's right to self-representation; and (10) that the courts and officials involved in this case have created a "cover up."[3]

---

[2] After filing the notice of appeal, Appellant also filed a motion for reconsideration. The court denied the motion for reconsideration on February 29, 2024, based on the pending appeal. Moreover, the court noted that it would see no reason to alter or amend its reasoning denying PCRA relief on February 1, 2024, in any event.

[3] Appellant's brief omits a statement of questions presented in violation of Pa.R.A.P. 2116. Nevertheless, we glean these issues from the summary of the argument section of Appellant's brief and the argument section itself. *(Footnote Continued Next Page)*

After a thorough review of the record, the briefs of the parties, and the applicable law, we conclude that the PCRA court's opinion properly disposes of the majority of Appellant's issues. (*See* PCRA Court Opinion, filed 2/1/24, at 21-28)[4] (finding: **(A)** Appellant argues that Commonwealth violated his right to confrontation by failing to present "critical witnesses" at trial, including Victim's boyfriend and laboratory technician who performed Victim's bloodwork; nevertheless, Appellant's claim is waived for purposes of PCRA under 42 Pa.C.S.A. § 9544(b), for failure to raise this issue in earlier proceedings;[5] **(B)** although Appellant argues that his right to counsel was violated when court removed trial counsel prior to trial, court removed trial counsel at **Appellant's** request; additionally, Appellant failed to raise this issue in earlier proceedings, so it is waived under Section 9544(b); **(C)**[6]

_____

Although Appellant's brief on appeal, which is handwritten and difficult to read at times, fails to comply with some other briefing requirements, we will address Appellant's claims as best we can discern them, as the PCRA court was able to analyze these issues in its opinion.

[4] We note that the PCRA court evaluates Appellant's claims in an order different than Appellant presents them in his summary of the argument section as outlined *supra*. We will summarize the court's findings in the order presented in the PCRA court's opinion.

[5] *See* 42 Pa.C.S.A. § 9544(b) (stating issue is waived for purposes of PCRA if petitioner could have raised it but failed to do so before trial, at trial, during unitary review, on appeal or in prior state postconviction proceeding).

[6] The PCRA court addresses two claims of ineffectiveness in this section. One of Appellant's claims is that trial counsel was ineffective in failing to object to calculation of Appellant's prior record score. The PCRA court concludes that

*(Footnote Continued Next Page)*

Appellant complains that original PCRA counsel, Attorney Hobbs, was ineffective in filing "no merit" letter in response to Appellant's *pro se* PCRA petition; as relevant background, Attorney Hobbs had informed court that two of three claims raised in Appellant's *pro se* PCRA petition lacked merit but that Appellant did not want counsel to amend petition to exclude those frivolous claims; Attorney Hobbs then sought guidance from court, and court ultimately permitted Appellant to proceed *pro se* with claims that counsel had deemed frivolous; thus, counsel's actions in seeking to file "no-merit" letter concerning claims counsel deemed frivolous was reasonable under circumstances; moreover, Appellant did not suffer prejudice where court permitted him to move forward with those claims *pro se*;[7] **(D)** Appellant claims that Commonwealth failed to turn over prior to trial statement of Victim's boyfriend concerning Victim's alcohol intake on day of crimes; nevertheless, Appellant

---

Appellant failed to suffer prejudice in connection with this claim, and that the claim is waived in any event. (**See** PCRA Court Opinion at 22-23). As discussed **infra**, we disagree with this section of the PCRA court's analysis.

[7] In our prior disposition remanding this case, this Court noted that while PCRA counsel's actions were well-intended, it is PCRA counsel's duty to either (1) amend a defective PCRA petition to raise claims that counsel deems contain sufficient arguable merit; or (2) certify that no meritorious issues exist. We further noted that this Court has rejected as improper partial no-merit briefs such as the one in this case in which counsel argues against his client as to a fraction of the claims raised. **See Bent, supra** at 6 n.4.

Notwithstanding these procedural irregularities, we agree with the PCRA court that Appellant's claims of PCRA counsel's ineffectiveness on this ground merit no relief under the circumstances present here.

sought to use this evidence solely to impeach credibility of Victim; thus, Appellant cannot succeed on claim of after-discovered evidence under PCRA; **(E)** regarding Appellant's claim of judicial misconduct, although Appellant claims that trial judge used "n-word" during sentencing, trial judge was only referring to statement made by Appellant, who previously alleged that prior counsel had called him "n-word"; court ultimately found Appellant's testimony incredible that prior counsel had called Appellant "n-word"; **(F)** Appellant claims that court violated his rights in several respects by granting Commonwealth's motion to dismiss his PCRA petition in 2022; importantly, these issues are reasons for which this case was remanded by Superior Court in 2023 (*see **Bent, supra***); thus, they have been previously litigated pursuant to 42 Pa.C.S.A. § 9544(a);[8] **(G)** Appellant did not adequately develop his claims of constitutional violations under 5th, 6th, 8th, and 14th Amendments; because Appellant's claims are wholly conclusory and lacking in factual specificity, this issue is waived for purposes of PCRA; **(H)** Appellant did not suffer prejudice when court appointed new PCRA counsel in 2023 following Superior Court's remand decision; court appointed counsel due to previous issues regarding Appellant's waiver of counsel and *pro se*

---

[8] ***See*** 42 Pa.C.S.A. § 9544(a) (stating that for purposes of PCRA, issue has been previously litigated if highest appellate court in which petitioner could have had review as matter of right ruled on merits of issue; or it has been raised and decided in proceeding collaterally attacking conviction or sentence).

representation; appointment of new counsel was safeguard to protect Appellant's PCRA rights moving forward;[9] **(I)** Appellant did not develop argument regarding his recusal claim in PCRA petition; thus, issue is without merit; and **(J)** regarding Appellant's claim of "cover up," no relief is due for what is effectively Appellant's assertion of innocence wherein Appellant opines that "cover up" must have occurred because Appellant is actually innocent). Accordingly, we affirm on the basis of the PCRA court's opinion with regard to the above issues.

Nevertheless, Appellant's fourth issue presented in his summary of the argument section alleges that counsel was ineffective for failing to object to calculation of Appellant's prior record score. As previously mentioned in footnote 5, *supra*, the PCRA court addressed this claim in Section (C) of the court's opinion, and decided it merited no relief. Significantly, however, in this Court's prior decision remanding this case, we observed that "PCRA counsel indicated [at the December 17, 2021 hearing before the PCRA court] that sentencing counsel had acknowledged the error [regarding Appellant's prior record score], and that the Commonwealth stipulated that Appellant's prior record score was zero, not one, at the time he was sentenced." ***See Bent, supra*** at 3 n.2 (citing N.T. PCRA Hearing, 12/17/21, at 3). Ultimately,

---

[9] Following the court's appointment of counsel in 2023, Appellant ultimately sought to proceed *pro se*, which the court permitted following a hearing on November 28, 2023.

however, due to Appellant's subsequent requests to proceed *pro se* and numerous filings, that agreement to correct Appellant's prior record score never came to fruition. The Commonwealth now agrees that this Court should remand the matter "**only** to address the previously agreed to issue of resentencing to [correct the] Prior Record score. An agreement that the Commonwealth had reached with [Appellant] and his PCRA counsel, Attorney Hobbs in 2022." (Commonwealth's Brief at 31) (emphasis in original). In light of the Commonwealth's prior stipulation and representations on appeal, and in the interests of justice, we vacate and remand for resentencing utilizing Appellant's corrected prior record score of zero. Accordingly, we affirm in part, and vacate and remand for resentencing consistent with this decision.

Order affirmed in part. Judgment of sentence vacated. Case remanded for further proceedings consistent with this memorandum. Jurisdiction is relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 12/11/2024

IN THE COURT OF COMMON PLEAS FOR YORK COUNTY,
PENNSYLVANIA
CRIMINAL DIVISION

COMMONWEALTH OF
PENNSYLVANIA

:

:

V.

:  NO.: CP-67-CR-0002499-2018

:

JOSEPH FRANCESSCO BENT

:

**RECEIVED**

*By Clerk of Courts at 3:31 pm, Feb 01, 2024*

## ORDER AND OPINION IN SUPPORT OF ORDER

AND NOW, this 1st day of February 2024, the Court has before it the Superior Court's Order of August 9, 2023. Pursuant to the Superior Court's Order, this Court was to review the Defendant's *pro se* Amended Post-Conviction Relief Act Petition of March 25, 2022. Following a status hearing in this case on November 28, 2023, this Court granted the Defendant an opportunity to submit a final Amended Petition for Post-Conviction Collateral Relief. The Defendant filed an Amended Petition on December 8, 2023. Upon review of the record in this matter, we hereby **DENY** relief under the Post-Conviction Relief Act.

### I.    Procedural History

The Defendant was found guilty of one count of Rape by Forcible Compulsion[1], one count of Involuntary Deviate Sexual Intercourse by Forcible Compulsion[2], one count of Sexual Assault[3], one count of Aggravated Indecent Assault[4], and one

---

[1] 18 Pa.C.S.A. 3121(a)(1)
[2] 18 Pa.C.S.A. 3123(a)(1)
[3] 18 Pa.C.S.A. 3124.1
[4] 18 Pa.C.S.A. 3125(a)(1)

1

count of Indecent Assault[5] following a three-day jury trial from March 11 through March 13, 2020, before the, now retired, Honorable Judge Craig T. Trebilcock. The Defendant was sentenced to an aggregate term of 14 ½ years to 29 years in a State Correctional Institution on June 22, 2020. A post-sentence motion requesting reconsideration of the Defendant's sentence was filed on June 30, 2020, and was subsequently granted in part (finding that count 3 merges with count 2 for sentencing) and denied in part on August 19, 2020. Thereafter, a Notice of Appeal was filed by the Defendant on September 17, 2020. In an Order dated November 9, 2020, the Superior Court ordered the trial court to conduct an on-the-record inquiry as to whether the Defendant wished to proceed *pro se*. On December 4, 2020, following a *Grazier* hearing, Attorney Snyder was removed as appellate counsel for Defendant but was ordered to remain as stand-by counsel. On December 22, 2020, Defendant made a motion for bail pending appeal which was denied by Judge Trebilcock by Order dated January 11, 2021, due to the court's determination that Defendant remained a threat to society.

Judge Trebilcock then filed a Pa.R.A.P. 1925(a) requesting that Defendant's claim be granted on the issue of *ex post facto* probationary punishment and denied on all other grounds, on February 13, 2021. On June 22, 2021, the Superior Court

---

[5] 18 Pa.C.S.A. 3126(a)(1)

2

affirmed the Defendant's convictions but vacated his sentence in part due to the sentence constituting an illegal *ex post facto* violation. Defendant then filed a petition for allowance of appeal with the Supreme Court of Pennsylvania on July 22, 2021. Shortly thereafter, Defendant filed a Praecipe for Discontinuance with the Supreme Court on August 13, 2021. The Defendant then filed a Petition for Post-Conviction Relief on September 14, 2021. A PCRA hearing was scheduled for December 17, 2021, but was continued generally due to Defense Counsel's inability to amend the PCRA Petition.

On the record at the December 17th hearing, counsel for the Defendant, Attorney Charles Hobbs, placed on the record that the Defendant had raised three claims in his PCRA petition, and that counsel had determined that two of the three claims were without merit. *Notes of Transcript, December 17, 2021*, page 4. Attorney Hobbs then sought the advice of the court as to how to proceed with the case, as the Defendant did not grant Attorney Hobbs permission to amend the petition to withdraw the meritless claims. *Id*. Judge Trebilcock then asked the Defendant if he wished to proceed on his claims at that hearing, which the Defendant indicated he did. *Id* at 5. However, the Defendant then objected to appearing via Zoom for his PCRA hearing, at which point the court discontinued the hearing and indicated that it would be rescheduled in the future before this Court, as Judge Trebilcock was retiring in early January 2022. *Id* at 6.

3

Thereafter, on December 19, 2021, a *pro se* Motion to Amend his PCRA petition was docketed. A hearing was then scheduled for March 18, 2022. On January 27, 2022, the Defendant filed an Amended Brief for Appellant's PCRA. On March 15, 2022, the Commonwealth filed a Motion to Dismiss Defendant's Petition for Post-Conviction Relief based on the Defendant's refusal to allow PCRA Counsel to amend his PCRA Petition and his failure to conform to the requirements of the Pennsylvania Rules of Criminal Procedure. At the PCRA hearing on March 18, 2022, this Court granted the Commonwealth's motion to dismiss, and ordered the Defendant to file an amended petition as it related to the sentencing issue. Additionally, this Court ordered that, within five days, Attorney Hobbs send a copy of any records as requested by the Defendant. Attorney Hobbs filed a Notice of Compliance with Court Order on March 21, 2022, and his representation ended on that date.

The Defendant thereafter filed an Amended PCRA petition on March 25, 2022; however, this Amended Petition was mistakenly docketed as Case Correspondence. On April 20, 2022, the Commonwealth filed a Renewed Motion to Dismiss Defendant's Petition for Post-Conviction Relief on the grounds that Defendant failed to file an Amended Petition within 30 days, as ordered by the court. Unfortunately, due to the clerical error with the Defendant's petition being docketed as Case Correspondence, this Court granted the Commonwealth's Motion

to Dismiss on April 25, 2022. The Defendant's Amended PCRA Petition was then properly docketed as an Amended Petition on May 9, 2022. Additionally, on May 9, 2022, the Defendant filed a Motion to Reconsider the Court's order granting the Commonwealth's Motion to Dismiss. This Court then dismissed the Defendant's petition and denied the Defendant's Motion for Reconsideration on May 13, 2022.

On September 1, 2022, the Defendant filed a Notice of Appeal with the Superior Court. On September 20, 2022, the Superior Court indicated to the Defendant that the Notice of Appeal was improperly filed and should have been filed with the trial court. Thereafter, on October 17, 2022, the Defendant filed a renewed Notice of Appeal with this Court. This Court then filed a Pa.R.A.P. 1925(a) Opinion on November 30, 2022. We note that this 1925(a) Opinion was written without a 1925(b) statement from the Defendant, and that this was done in error on the part of this Court. On August 9, 2023, the Superior Court entered an Order requiring this Court to rule on the Defendant's Amended PCRA Petition of March 2022. The Superior Court then relinquished appellate jurisdiction. The Defendant then filed a Motion for Bail on August 21, 2023, which this Court denied on August 29, 2023. The Defendant then filed a Motion for Reconsideration of Bail on September 14, 2023, which this Court denied due to a lack of pending appeal on October 2, 2023.

Due to the Defendant raising Ineffective Assistance of Counsel as a claim in his initial PCRA Petition, this Court appointed PCRA counsel, Attorney Brandy Hoke, Esquire, to represent the Defendant on October 3, 2023. On October 29, 2023, Attorney Hoke filed a Motion to Withdraw as Counsel citing that she had attempted to contact the Defendant regarding this matter and that the Defendant indicated that he did not want counsel to represent him. This Court then scheduled a hearing on Attorney Hoke's motion to withdraw. A hearing was held on November 28, 2023, during which time 1) Attorney Hoke's motion to withdraw was granted, 2) it was ordered that the Defendant would have 14 days to make any changes to the active PCRA petition, and 3) it was further ordered that the Commonwealth would have an additional 14 days to respond to the petition.

Thereafter, the Defendant filed a Motion to Dismiss All Charges pursuant to Pa.R.Crim.P. 600 on December 1, 2023, an Amended PCRA on December 8, 2023, and a second Motion to Dismiss All Charges on December 19, 2023. Additionally, on December 6, 2023, Attorney Hoke filed a Motion for Payment of Counsel Fees, which this Court granted on December 11, 2023; in response, the Defendant filed Case Correspondence which this Court reads as a "Motion of Awareness," in which the Defendant requested clarification as to whom Attorney Hoke represented.

## II. Facts

The facts of this case were previously laid out in the Opinion Pursuant to Pa.R.A.P. 1925(a) filed by the trial judge, Judge Trebilcock, in this case on February 13, 2021. For judicial expediency, we will reproduce that portion of the Opinion below:

> The first witness to testify was the victim, Emily Lee (nee Gephart). She testified that on July 12, 2017, around 3:30 p.m., she was working as a licensed practical nurse at the [Defendant's] residence. Notes of Trial Transcript at 140-42, 144. She was tasked with attending to the [Defendant's] teenage son. She further testified that she had been to the [Defendant's] residence approximately three or four times prior to the day on which the [Defendant] raped her. N.T. at 143. The victim stated the [Defendant's] son had never needed assistance from her, but she had always asked the child if he needed anything before leaving him alone to play his computer games in his bedroom. N.T. 144-45. The victim stated that on July 12, 2020, she was using this slow period to study her nursing curriculum, when the [Defendant] came home from work. N.T. 145.
>
> The [Defendant] who was employed as a property manager by his parents, was angry when he arrived home, due to a tenant's failure to pay a bill. N.T. at 145. Shortly after arriving home the [Defendant] offere the victim a beer, which she accepted. N.T. at 147. When asked why she took the beer while on the job, she stated, "I can't even explain how stressed out I was. It was so hard. The nursing school, it was accelerated. It was hard work. I had a baby and I was working still. I was working part time. I had just come from school when I went to work that day. I don't know. My reasons wouldn't justify doing it, but I'd say that I was vulnerable to making a bad decision I guess if I thought it would relieve my stress." N.T. at 147-48. After accepting the beer, the [Defendant] told the victim that he was going to smoke some marijuana in his bedroom and she could join him "or go outside." N.T. at 148. The victim went with him into his bedroom, sat on his bed, and smoked marijuana. N.t. AT 148-49. She said she drank a single beer and did not know how marijuana she smoked as it was not a regular habit with her, and that she felt impaired by the combination. N.T. at 149.

The victim testified that after smoking the marijuana the [Defendant] chatted with her on the bed before moving very close to her. N.T. at 149-50. The victim interpreted the [Defendant's] movement as a sexual advance and testified that she told him no immediately. She testified that she said, "I told him no. I said this is not going to happen, we're not doing this. And he- he didn't' move away when I said no. He still had his hand on me. He still was right there. I told him no. He did not move away until I said that I had just gotten engaged." N.T. at 150. The [Defendant] then tried to make small talk about the victim's engagement and told the victim that he wanted to be her "best friend." N.T. at 150. Abruptly, while the two were still conversing and the victim was telling the [Defendant] about her engagement to her child's father, the [Defendant] put his arm around the victim, put his mouth to her ear, and said, "I want to lick your pussy." N.T. at 151. The victim testified that her response was to immediately jump up and get away from him. N.T. at 151.

She testified that she left the bedroom but that she felt too inebriated to drive away from the [Defendant's] residence, despite her desire to do so after her interaction with the [Defendant] in his bedroom. N.T. at 152. The victim testified that when she left the bedroom the [Defendant] followed her into the living [room] while she sat down on the couch and began crying. She testified that she began crying because 'I thought I was going to lose my job. I thought I was going to ruin like everything that I was working for. For me to do something like that when I was working and call myself somebody who wants to be a nurse and to do something that would put me in this position. I felt so stupid. I felt so scared. I felt like I just made a royally bad decision, you know?" N.T. at 152. The [Defendant] then sat down next to the victim on the couch and asked her why she was crying. She expressed that she was afraid of losing her job. The [Defendant] then pulled out his cell phone and started to type a message and the victim testified that the [Defendant] said, "so that's how it's going to be." N.T. at 153. The victim interpreted the [Defendant's] actions as an attempt to report her to her employer. N.T. at 153.

Sometime shortly after this interaction, the victim testified that the [Defendant] stood up from the couch and "he kind of guided me to my feet like by my arm," and brought her back into his bedroom. She testified that she was pushing him a little bit at this point. N.T. at 154.

After the [Defendant] led the victim back into his bedroom, he attempted to undress her while she was standing near the door of his

8

bedroom. N.T. at 154. The Victim testified that she was attempting to keep the buttons of her shirt together while he was unbuttoning them. N.T. at 155. The victim also testified that the [Defendant] put his mouth on her neck, kissing her, while attempting to undress her. N.T. at 155. She was trying to get away from him while this was happening. N.T. at 155. However, she was pressed up against a wall while this was happening. N.T. at 156. After failing to unbutton her shift, the [Defendant] attempted to undo her parnts and then put her on the bed. N.T. at 156. The victim testified that she stated "no" repeatedly while all this was taking place. N.T. at 157. While she was laying on the bed the [Defendant] removed the victim's pants and underwear. N.T. at 157. The victim testified that once her pants were off, the [Defendant] performed oral sex on her. The [Defendant] also put his finger inside her genitals. N.T. at 157-58.

After this first assault, the [Defendant] pulled down his pants and put his penis inside her vagina. N.T. at 158. When the victim was asked if she said no at this point, she testified that she could not speak at that moment. She also testified that she was too scared to move. N.T. at 159. She said she felt paralyzed, but that she was trying to move. N.T. at 160. The [Defendant] was on top of the victim at this point. N.T. at 160. While the victim testified that she was not sure how long this went on for, at some point the [Defendant] stated, in the victim's words, "I'm not going to bust in you, I'm going to bust on you, Emily." N.T. at 160. The victim testified the [Defendant] ejaculated on her lower abdomen. N.T. at 160-61. The [victim] testified that she was not allowed to leave from the time the [Defendant] brought her back into his room to the time he finished assaulting her. N.T. at 161. When asked if he prevented her from leaving, she stated, "Well, yes. He was in constant contact with my body. He was – my main focus was stopping the very – each little thing he was doing in the moment as far as removing clothes, trying to counter everything." N.T. at 161.

After the [Defendant] finished, the victim was asked what she did after he left the room. She stated, "I started to move. It took me a little bit to get myself up, but I stood up and pulled my pants up, put my pants on." N.T. at 161. After putting her clothes back on, the victim went to a bathroom across the hall and cleaned off her stomach. N.T. at 161-162. After cleaning herself off, the victim got into her car, left the [Defendant's] residence, and went to York Hospital to report the rape. N.T. at 162-63. The victim ended her direct testimony by reiterating that

9

at no point did she consent to having sexual contact with the [Defendant] and by identifying him in the courtroom. N.T. at 165.

On cross examination, the victim testified she was taking medication for anxiety and bipolar at the time the rape occurred but that she could not remember the specific medication she was on in 2017. N.T. at 170-71. She also testified again that she did drink a beer and smoke a small amount of marijuana and that she wanted to leave before the rape occurred, but that felt that she was too impaired to drive away. N.T. at 173-74. The most telling exchange of the cross examination came when the [Defendant], acting as his own attorney, asked the victim, "Are you one hundred percent sure you said no to sex?" N.T. at 175. The victim responded, "Yes, I am one hundred – I said no over 50 times, Joseph." *Id.* The [Defendant] then followed up with, "Are you one hundred percent sure that I ejaculated on your belly?" To which the victim responded, "150 percent. You were there. You know this." *Id.* The [Defendant] then asked, "Are you one hundred percent certain sure that I took you back to the bedroom?" *Id.* To which the victim responded, "Yes. I am certain it was you." *Id.* The [Defendant] resumed this style of questioning near the end of cross examination and asked, "I would ask you one more time. Are you one hundred percent sure, are you one hundred percent sure that we had sex?" N.T. at 193. To which the victim forcefully and tearfully responded, "We did not have sex, You raped me. Listen, you – I'm sorry, my wording – you raped me, okay? There's a difference. You – Okay. Okay. I need a second here to breathe because I cannot believe I'm hearing this. I really cannot believe [I'm] hearing this." *Id.*

On redirect examination the victim testified that she had filed for a Protection from Abuse (PFA) order the very next day. N.T. at 194. She also testified about the effect her medication had on her in combination with the marijuana and beer she had consumed. When asked if her medication could affect her ability to perceive and remember the events that happened on July 12, 2017, she stated, "They certainly couldn't take away the memory of what happened to me. The thing about it is, the way it affects my memory, it doesn't create a false memory. Sometimes it makes it harder to remember, so the things that – it's like if I'm trying to remember something, it's just not there. It's not like something is there that shouldn't be, if that makes sense. I don't know if I'm explaining that like well." N.T. at 200.

After the victim testified, the Commonwealth called the Sexual Assault Forensic Examination (SAFE) nurse, Tami Hartlaub. On direct

10

examination, she testified regarding the procedures during the SAFE exam of the victim. The nurse began the exam at 8:05 p.m. on July 12, 2017, and completed the exam at 3:00 a.m. the next day. The nurse testified that she began the exam the same way she typically begins such exams, by obtaining a medical history from the victim. N.T. at 216-17. The nurse said the victim was very distraught when she arrived and was sobbing uncontrollably. N.T. at 218. As part of the medical history the nurse asked the victim to specify the allegations of sexual contact. The victim told her that her vagina had been penetrated by the [Defendant's] penis and finger and that she was unsure, but that her anus may also have been penetrated by the [Defendant's] finger. N.T. at 220.

The nurse testified as to what physical evidence she collected from the victim. She collected the victim's clothing, oral swab samples, finger nail samples, pubic hair combing samples, external genitals swab, vaginal assault swabs, rectal assault swabs, and a buccal swab. The nurse also collected swabs from the right side of the victim's neck and her lower abdomen. N.T. at 222-24. These items were sealed with evidence collection tape and turned over to the police. N.T. at 226-27.

On cross examination the nurse testified that she used a special light to examine the victim's neck and abdomen for further evidence of secretions. The victim's neck fluoresced, indicating the possibility of dried secretions but her abdomen did not. N.T. at 231-32. On redirect examination, the nurse explained, "the light exam does not always reflect everything that may be on a person's skin, so that's why we obtain those swabs secondary to the patient's report regardless of whether we have any actual findings with the light source or not. The patient could have cleansed that area, wiped it off with whatever she had handy at the moment, and she could have removed any of the DNA that — or semen that had been put on her skin." N.T. at 232-33. The nurse also testified that there's no physical evidence that can be collected to determine whether an act was consensual or non-consensual. N.T. at 233.

The next witness called by the Commonwealth was John Bumstead, detective with the Northeastern Regional Police Department. Detective Bumstead testified to interviewing the victim on July 13, 2017, and collecting a DNA sample from the [Defendant]. N.T. 237-38, 240-41. He also testified as to the chain of custody of the sexual assault kit collected from the victim and the DNA sample collected from the [Defendant]. N.T. at 242-44.

11

On cross examination, the [Defendant] asked Detective Bumstead why he did not obtain a search warrant to search his apartment. N.T. at 259. The officer stated, "I received this information and it was several days until after the initial incident had occurred. I – once I completed some information and then I did an initial interview [with the victim], from that time point I also know from other investigations that evidence can be destroyed." Id.

On redirect examination, the Commonwealth asked the detective why he did not question the victim about regarding any act of oral sex she may have performed on the [Defendant] during his first interview with the victim. He testified that he did not ask the victim about that because she did not volunteer it in the narrative she provided during his interview of her. N.T. at 265-66.[2]

The next witness called by the Commonwealth was Bradley McLaughlin, forensic serologist for the Pennsylvania State Police. The serologist testified regarding the swabs and DNA samples collected from the victim and [Defendant]. First, he testified as to the chain of custody and that the evidence collection kit as sealed when it arrived at his office. N.T. at 275-77. He testified that the items from the sexual assault kit that were tested included the vaginal sample, the rectal sample, the oral sample, the external genitalia sample, the swabs from the lower abdomen, the swabs from the right side of the victim's neck, the buccal swab. The pubic hair combings, the fingernail samples, the control swabs, and the clothing were not tested as per department policy of first testing items that would yield more probative evidence before sending out items of secondary importance. N.T. at 278-79.

The vaginal and rectal samples both came back negative for seminal material. N.T. at 279. On direct examination the serologist testified that the oral was tested for seminal material and came back negative and therefore no confirmatory test was performed after the test for seminal material came back negative. N.T. at 281. The external genitalia sample did not return positive results for the presence of seminal material. A confirmatory test, using a microscope, revealed the presence of spermatozoa. N.T. at 281. The test of the lower abdomen sample came back negative. Id. The test of the neck swab came back positive for the presence of saliva. Id. The buccal swabs, from the victim and [Defendant], are merely used to determine which DNA belongs to which person. N.T. at 281-82.

On cross-examination, the serologist was asked in particular about the oral swab taken from the victim. The serologist stated:

The oral sample would have been item 1.3 that was collected from the inside of Emily Gephart's mouth, so those are the swabs that I tested. The testing that I performed on this, the presumptive test was negative. We went on and did the slides looking for the presence of spermatozoa. No spermatozoa were identified.

We have a third test which is called p30. P30 is an enzyme protein that's present in high concentrations in seminal fluid. That particular testing was positive. It's not a confirmatory test for seminal material because p30 is present in other bodily fluids, not in the concentration that it is in seminal fluid, but it is present in other body fluids, so we considered it a presumptive test.

So that's why the conclusion reads presumptive chemical testing indicated the presence of seminal fluid, however no spermatozoa were identified. N.T. at 289-90.

The [Defendant] then asked the serologist for his opinion on why the spermatozoa would be so low. The serologist stated, "it would be very hard for me to speculate. I perform chemical tests and examine the evidence. I can't really speculate on how it got there or the circumstances of this particular case." N.T. at 290. The [Defendant] asked a similar question with regard to the lack of seminal fluid found on the victim's abdomen and the serologist gave substantially the same answer. N.T. at 291-292.

The next witness called by the Commonwealth was Zachary Tanczos, expert in forensic DNA, employed with the Pennsylvania State Police to test the DNA samples in this case. The forensic expert testified on the DNA profiles as they related to the samples collected from the victim and the [Defendant]. First, he explained his testing procedures. N.T. at 303-307. Then he went into the details of the report he produced for this case. N.T. at 308-320. His analysis included the two buccal swabs, one from the [Defendant] and one from the victim, and five items that were provided to him for testing: the vaginal swabs, the rectal swabs, the victim's oral swabs, the external genitalia, and the neck sabs. He explained that the samples were tested for sperm fractions and non-sperm fractions. When DNA from a sperm fraction is present it is more likely to come from a sperm cell, but it is not certain to be from such a cell. N.T. at 305-06, 314. The vaginal sample indicated DNA from two people but there was insufficient DNA from anyone other than victim to lead to a conclusive identification. N.T. at 310-12. The rectal sample did have a major component match with the DNA profile of the [Defendant]. The non-sperm fraction of the oral

13

sample contained the DNA of two people and the expert stated, "Emily Gephart and Joseph F. Bent cannot be excluded as potential contributors to this mixture in it was 19 out of the 24 testing locations. The remaining locations were inconclusive due to the stochastic effects observed." N.T. at 315.

When asked to clarify the expert testified, "when stochastic effects come into play, what that means is one or both of those people in this mixture profile are contributing – there's not that much DNA in there, that they are essentially not representing themselves fully in the entire mixture." *Id.* The sperm fraction of the external genitalia swab was "consistent with a mixture of at least three individuals." N.T. at 316. The major component of the sperm fraction was consistent with the DNA profile of the [Defendant]. N.T. at 316. The sample from the neck matched the DNA profile of the victim. N.T. at 317.

The expert then testified about another test, focused on the male Y-chromosome, he performed on the samples. The non-sperm fraction of the vaginal swab, when tested with this method, revealed a DNA profile that "matched the male profile of Joseph F. Bent." N.T. at 319. The expert further stated, "We would expect to see this provide in every one of 8,696 individuals." *Id.*

On cross examination, the [Defendant] asked the expert many clarifying questions, which the expert answered. N.T. at 321-29. The [Defendant] also asked the expert about spermatozoa found in the victim's oral sample, but he likely misstated or misunderstood the prior testimony of the expert and was referencing the sperm fraction of the oral sample. The expert answered, "I tested the sperm and non-sperm fraction of the oral samples. From the sperm fraction there was a single individual, and that DNA and that profile matched the profile of Joseph F. Bent." N.T. at 329-30.

The [Defendant] testified on his own behalf during his defense. Much of the [Defendant's] testimony focused on his life prior to July 12, 2017. Much of it was not relevant to the proceeding except as background information to his self-professed virtue. N.T. at 345-49. However, he did put forth his version of events of that day as well. He testified that he arrived home around 4:20 p.m. after working on a tenant's apartment in Lancaster. He said he arrived home angrily talking to his ex-wife about the condition of the apartment. N.T. at 350. He claimed he told the victim to leave after he got off the phone. He testified that she refused to leave and said she was "in no position to leave." N.T. at 352. The [Defendant] testified that the victim said she

14

already had one of his beers, before he arrived home. [3] *Id.* He testified that she was, at this point, afraid that he was going to get her in trouble with her employer. He said that he told her he would not do that, and that he at that point tried to get out of the house. *Id.* He testified that "she jumped in the way in the front of the door" and prevented him from leaving. [4] *Id.* The transition is not clear from the record but after this interaction, the [Defendant] testified he made a phone call to his electric company. N.T. at 353. After that call the [Defendant] showered while the victim was outside. *Id.* The [Defendant] testified, in a very confused fashion, that after the shower he and the victim were sitting on his couch together talking. N.T. at 354. After this statement, the [Defendant's] testimony devolved into a series of assertions that would have been more appropriate for a closing argument than direct testimony. He was admonished by the Court for this and continued testifying. N.T. at 356-57. He ended his direct testimony with, 'So the facts is me and Emily have sexual contact, innocent, innocent sexual contact. No, I did not put Emily against any wall. I did not throw Emily on the bed. Emily willingly walked into my bedroom, willingly walked into my bedroom. Every other nurse that comes to my house for the past 15 years never had a problem. Never had a problem. Why would I choose this one time? Never had a problem. Emily and I had consensual sexual contact. That's what it was. Consensual sexual contact. I never touched her, never put my had on her in one way, shape or form. That's what I have to say.' N.T. at 358-59.

On cross examination, the [Defendant] was asked about his claim that the victim performed oral sex on him and was asked where he might have ejaculated. His response was "did not." When asked the follow up question, "You didn't ejaculate?" he gave the following lengthy response: 'As I said, whatever was going on in her head, again, the truth is stranger than fiction. She came in here and she'll tell you that I threw her up against the wall to make it sound like that's what happened. The truth is stranger than fiction, and the evidence prove that my truth adds up. The truth is stranger than fiction. If they are going to come in here and tell you – that doctor is going to tell you that a napkin can wipe off body parts, but your shirt, your shirt cannot wipe off saliva, your shirt cannot wipe off saliva off your neck, it's a prudent person would not believe that. If they are going to say that the cloth can wipe off body parts, then how did they find – how did they find semen on her? That means her underwear should be able to remove that, pulled and removed that. That's what that means. So if they are going to come

15

here and tell you, what's the most prudent thing would you believe? I did not. Like I said, once she got off of – once she et off of what she was on, she was doing, because, again, I didn't know – I didn't know what was going on with her. I did not know. I did not know what was going on with her. She go from one state to another stage. I did not know what was going on with her. I tried to like ask her plenty of times to go because she did not make an attempt. She jumped in my way. I went to my bedroom. Emily came into my bedroom and kicked my door off, and I said I don't understand what the heck is going on.' N.T. at 371-72.

The [Defendant] was then asked, "She kicked your door off?" N.T. at 372. To which he responded, "She kicked my door off, yes." *Id.* When asked why he did not report this damage to the police he said, "Well I'm supposed to tell the police how to do their job now? Is that my job? The police didn't do his job and that's my fault." N.T. at 373. When asked why did you not mention the door being "kicked off" at the PFA hearing that took place shortly after July 12, 2017, the [Defendant] stated, "Again, I said she punched it. I didn't say the door was broken. I didn't say the door was broken. I said the mirror that was on the back of the door that was on a new latch because of the vibration jumped off. I didn't say the door was broken." *Id.* Eventually the [Defendant] answered the original question about whether he ejaculated and said, "not knowingly, no. Not knowingly I did not. I did not knowingly ejaculate, no." *Id.* The [Defendant] also testified, 'She and I have oral sex. When we done with oral sex, this is where I think the story changes. She said to me that she was engaged, and I looked her and said – and I said why didn't you tell me this before this happened, I'm going to the golf course. That's what I did.' N.T. at 382-84.

The jury convicted him on all counts.

*Opinion Pursuant to Pa.R.A.P. 1925(a)*, February 13, 2021, pages 2-14.

## III.   PCRA Motion

As an initial matter, we note that a court cannot have jurisdiction to hear an untimely PCRA petition. *Commonwealth v. Robinson*, 837 A.2d 1157, 1161 (Pa. 2003) (citing *Commonwealth v. Rienzi*, 827 A.2d 369, 371 (Pa. 2003) (citations

omitted)). "[A]ny PCRA petition, including a second or subsequent petition, must be filed within one year of the date the judgement becomes final." *Commonwealth v. Breakiron*, 781 A.2d 94, 97 (Pa. 2001) (citing 42 Pa.C.S.. §9545(b)(1)). And "[a] judgment becomes final at the conclusion of direct review or at the expiration of time for seeking the review." *Id.* The time to seek direct review of our Supreme Court is within thirty days of the Superior Court's determination. See Pa.R.A.P. 1113(a). In the instant case, judgement became final following the Superior Court's Order, affirming the Defendant's convictions, on June 22, 2021. Notably, the Defendant did file a Notice of Appeal with the Supreme Court; however, a Praecipe for Discontinuance was filed with the Supreme Court on August 13, 2021. Therefore, the Defendant would have had until June 22, 2022, to timely file a PCRA Petition in this case. The Defendant filed the instant PCRA Petition on September 14, 2021, with an Amended Petition filed on March 25, 2022, both of which are within the time frame required by 42 Pa.C.S. §9545(b). Procedural defects, addressed *supra*, have led us to the instant Amended PCRA petition being filed by the Defendant on December 8, 2023.

We now move to the Defendant's timely PCRA claims. The Defendant presents, from this Court's view, ten claims for review:

A. A violation of the Defendant's right to confrontation

B. A violation of the Defendant's right to counsel

17

C. Ineffective assistance of counsel

D. Newly discovered evidence

E. Judicial misconduct

F. PCRA court error

G. 5th, 6th, 8th, and 14th amendment violations

H. Right to self-representation

I. Judicial recusal

J. Cover-up

*Defendant's Amended PCRA Petition, December 8, 2023*, supplemental pages 4-10.

To be eligible for PCRA Relief, a Defendant must plead and prove by a preponderance of the evidence all of the following:

(1) That the petitioner has been convicted of a crime under the laws of this Commonwealth and is at the time relief is granted:

    (i) Currently serving a sentence of imprisonment, probation, or parole for the crime;

    (ii) Awaiting execution of a sentence of death for the crime;

    (iii) Serving a sentence which must expire before the person may commence serving the disputed sentence; or

    (iv) Has completed a sentence of imprisonment, probation, or parole for the crime and is seeking relief based upon DNA

18

evidence obtained under section 9543.1(d) (relating to

postconviction DNA testing).

(2) That the conviction or sentence resulted from one or more of the

following:

    (i)     A violation of the Constitution of this Commonwealth or the

            Constitution or laws of the United States which, in the

            circumstances of the particular case, so undermined the

            truth-determining process that no reliable adjudication of

            guilt or innocence could have taken place.

    (ii)    Ineffective assistance of counsel which, in the circumstances

            of the particular case, so undermined the truth-determining

            process that no reliable adjudication of guilt or innocence

            could have taken place.

    (iii)   A plea of guilty unlawfully induced where the circumstances

            make it likely that the inducement caused the petitioner to

            plead guilty and the petitioner is innocent.

    (iv)   The improper obstruction by government officials of the

            petitioner's right of appeal where a meritorious appealable

            issue existed and was properly preserved in the trial court.

    (v)    Deleted.

19

(vi)   The unavailability at the time of trial of exculpatory evidence that has subsequently become available and would have changed the outcome of the trial if it had been introduced.

(vii)   The imposition of a sentence greater than the lawful maximum.

(viii)   A proceeding in a tribunal without jurisdiction.

(3) That the allegation of error has not be previously litigated or waived.

(4) That the failure to litigate the issue prior to or during trial or on direct appeal could not have been the result of any rational, strategic, or tactical decision by counsel.

*42 Pa.C.S. §9543.*

An issue raised by a Defendant's PCRA petition has been previously litigated if: the highest appellate court in which the petitioner could have had review as a matter of right has ruled on the merits of the issue or it has been raised and decided in a proceeding collaterally attacking the conviction or sentence. *42 Pa.C.S. §9544(a).* An issue is waived if the Defendant could have raised it but failed to do so before trial, at trial, on appeal, or in a prior state postconviction proceeding. *42 Pa.C.S. §9544(b).*

20

## A. Right to Confrontation

In the Defendant's first claim for PCRA relief, the Defendant argues that the Commonwealth violated the Defendant's right to confrontation when they did not present critical witnesses at trial. These "critical witnesses" include: the Victim's boyfriend and the laboratory technician who did the Victim's blood work. Prior to the commencement of trial, the Commonwealth's attorney provided a list of the witnesses they would be calling to both the Defendant and the Trial Court. The Defendant did not object to this list at the time. The relevant portion of the transcript is attached hereto as "Appendix A." Additionally, the Defendant had the same right and opportunity as the Commonwealth to call any witness he wished to have at trial and examine them on the record, and he did not exercise that right. This issue should have been raised at trial, in a post-sentence motion, or on direct appeal and was not. Therefore, this issue is waived for purposes of PCRA, pursuant to 42 Pa.C.S. §9544(b).

## B. Right to Counsel

In the Defendant's second claim for PCRA relief, the Defendant argues that his Sixth Amendment right to counsel was violated when the Trial Court removed counsel prior to trial. The Defendant alleges that Judge Trebilcock was prejudicial in this decision. Importantly, counsel, Attorney George Marros, was removed as counsel upon the request of the Defendant. The relevant Order is attached hereto as

21

"Appendix B." Additionally, this issue should have been brought up at trial, in a post-sentence motion, or on direct appeal and was not. Therefore, this issue is waived for purposes of PCRA, pursuant to 42 Pa.C.S. §9544(b).

### C. Ineffective Assistance of Counsel

In the Defendant's third claim, he raises Ineffective Assistance of Counsel on two occasions. To obtain relief on a claim of ineffectiveness of counsel, the Defendant must satisfy the performance and prejudice test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). In Pennsylvania, the *Strickland* test requires a petitioner to establish that: (1) the underlying claim has arguable merit; (2) no reasonable basis existed for counsel's action or failure to act; and (3) the petitioner suffered prejudice as a result of counsel's error with prejudice measured by whether there is a reasonable probability that the result of the proceeding would have been different. A failure to satisfy any prong of the test for ineffectiveness will require rejection of the claim. *Commonwealth v. Ali*, 608 Pa. 71, 86 (2010). Overall, counsel is presumed to have rendered effective assistance. *Commonwealth v. Housman*, 658 Pa. 49, 68 (2020).

The Defendant first contends that Trial Counsel erred by not objecting at sentencing as it relates to the Defendant's prior record score. The Defendant indicates that his prior record score was a zero (0) as opposed to a one (1). Importantly, it is unclear that the Defendant would be prejudiced by this error. The

22

standard range for a prior record score of zero (0) for the crimes for which he was convicted would be 12.5 to 25 years. The standard range for a prior record score of one (1) for the crimes for which he was convicted would be 15 to 30 years. Additionally, the maximum allowable sentence for the crimes for which the Defendant was found guilty was in excess of 50 years. The Defendant was sentenced to an aggregate term of 14.5 to 29 years, which is in the middle of the standard ranges listed above. Therefore, Defendant does not appear to have been prejudiced by this error. Further, this issue should have been raised in a post-sentence motion or on direct appeal and it was not. Therefore, pursuant to 42 Pa.C.S. §9544(b), this issue is waived.

The Defendant next contends that PCRA Counsel was ineffective in filing a "no merit letter" in response to the Defendant's *pro se* PCRA petition. The Defendant argues that PCRA Counsel was ineffective due to raising arguments "against his client as to a faction of the claims raised in the *pro se* petition." *Defendant's Amended PCRA Petition.* In determining whether counsel was ineffective for filing a "no merit letter," we need to look no further than element number two (2) of the *Strickland* test: Whether Counsel had a reasonable basis for his action or inaction.

Primarily, a lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis in law and fact for doing so that

23

is not frivolous, which includes a good faith argument for an extension, modification or reversal of existing law. *Pa. St. RPC R. 3.1*. Further, the right of an attorney to withdraw as PCRA Counsel due to meritless claims, and the process under which they may do so, was established in *Commonwealth v. Turner*, 518 Pa. 491 (1988): When, in exercise of his professional judgement, counsel determines that the issues raised under the [PCRA] are meritless, and when the [PCRA] court concurs, counsel will be permitted to withdraw and the petitioner may proceed *pro se*, or by privately retained counsel, or not at all. Further, it was established in *Pennsylvania v. Finley*, 481 U.S. 551 (1987), that the right to appointed counsel extends to the first appeal of right, and no further. Because a defendant has no federal constitutional right to counsel when pursuing a discretionary appeal on direct review of his conviction, he will have no such right when attacking a conviction that has long since become final upon exhaustion of the appellate process. *Id* at 555.

In the instant case, PCRA Counsel, Attorney Charles Hobbs, indicated that two of the three claims raised in the Defendant's *pro se* PCRA Petition were without merit but that the Defendant would not allow him to amend the petition to exclude the frivolous claims. Owing a duty to both the Defendant and to the Court, Attorney Hobbs sought guidance from the original PCRA Court, which allowed the Defendant to proceed on his claims without the assistance of counsel. It is clear,

pursuant to his duties to the Court, that Attorney Hobbs had a reasonable basis for his actions. Additionally, it is unclear the Defendant suffered any prejudice as a result of this action, as the Court permitted him to move forward with all of his PCRA claims *pro se*. We therefore find that this issue is without merit.

### D. Newly Discovered Evidence

The Defendant alleges that the Commonwealth erred by not turning over evidence when asked before trial. The relevant evidence is a statement made by the Victim's boyfriend to the police. While the Defendant did not indicate in the instant PCRA petition what this statement would be, it was previously raised in the Defendant's *pro se* petition for PCRA relief of September 14, 2021. In that petition, the Defendant indicated that "the Commonwealth did not present evidence that would support the fact that [the victim] was not telling the truth about her intake of alcohol on [the day of the incident leading to these charges]." To obtain postconviction relief based on after-discovered evidence, a Post Conviction Relief Act (PCRA) petitioner must demonstrate that the evidence: (1) could not have been obtained prior to the conclusion of the trial by the exercise of reasonable diligence; (2) is not merely corroborative or cumulative; (3) will not be used solely to impeach the credibility of a witness; and (4) would likely result in a different verdict if a new trial were granted. *Commonwealth v. Foreman*, 55 A.3d 532 (Pa.Super. 2012). In the instant case, it is clear that the evidence the Defendant

25

wished to use would be used solely to impeach the credibility of the victim in this case, by asserting that she was lying. Therefore, we find that this claim is without merit and that the Defendant cannot obtain relief on this matter.

### E. Judicial Misconduct

The Defendant alleges that the Trial judge was guilty of misconduct when he uttered the word "n****r" to the Defendant, a black man, at sentencing. This word was only said during sentencing when Judge Trebilcock was citing the Defendant who had previously alleged that one of his attorneys had called him a "n****r." This was in reference to the fact that the Trial Court found the Defendant to be not credible, in that he would lie and say virtually anything to get out of trouble. The relevant portion of the sentencing transcript is attached hereto as "Appendix C." We therefore find that this issue is without merit.

### F. PCRA Court Error

The Defendant argues that the PCRA Court erred in the following ways: a violation of the Defendant's due process rights by not complying with Rule 907 for dismissal; prejudice to the Defendant due to an erroneous statement in this Court's 1925(a) statement of November 2022 that indicated the Defendant's petition was dismissed for being untimely filed; and bias against the Defendant when the Court dismissed his PCRA for untimely filing. Importantly, these issues are the reasons for which this case was remanded to this Court by The Superior Court. We

therefore find that these issues have been previously litigated, pursuant to 42 Pa.C.S. §9544(a), or are addressed herein.

## G. 5th, 6th, 8th, and 14th Amendment Violations

The Defendant raises 5th, 6th, 8th, and 14th amendment violations in his PCRA petition. However, the Defendant does not elaborate on these alleged violations and addresses them no further than asking, "were the Petitioner's rights violated?" Defendants are not entitled to relief on allegations of unconstitutional administration where allegations are wholly conclusory and lacking in factual specificity. *Wilson v. Post Conviction Hearing Act of Com. of Pa.*, 321 F.Supp. 1234 (W.D. 1971). Because the Defendant's allegations are wholly conclusory and lacking in factual specificity, this issue is without merit and is waived for the purposes of PCRA.

## H. Right to Self-Representation

The Defendant alleges that his 6th amendment right to self-representation was violated by this Court's appointment of court-appointed counsel for the instant PCRA petition, following remand from The Superior Court. This is not a claim for which Post-Conviction Collateral Relief can be granted pursuant to 42 Pa.C.S. §9544(2). Further, this Court appointed counsel to the Defendant due to previous issues regarding this Defendant's waiver of counsel and *pro se* representation. The appointment was merely a safeguard to protect the Defendant's PCRA rights

27

moving forward. The appointment of counsel did not prejudice the Defendant in any way. We therefore find that this issue is without merit.

### I. Recusal

The Defendant listed "recusal" as an issue he intended to address in his PCRA petition. The Defendant did not discuss this issue further. Therefore, we find that this issue is without merit.

### J. Cover-Up

In the Defendant's final issue, he alleges that a "cover-up" is taking place in this case. He maintains his innocence as a reason that this "cover-up" is taking place and alleges all the facts he had previously raised as PCRA claims. This issue is without merit. This is not a claim for which relief can be granted under the Post-Conviction Relief Act pursuant to 42 Pa.C.S. §9543(2).

### IV.  Conclusion

Based upon the reasons stated above, this Court **DENIES** Defendant's claims for PCRA relief. No relief is granted.

### V.  Defendant's Motions to Dismiss

As indicated *supra*, the Defendant filed three motions to dismiss all charges against him. One was filed December 1, 2023, another was filed on December 8, 2023 (attached to the Defendant's Amended PCRA Petition), and the third was filed December 19, 2023. The Defendant's December 1st motion to dismiss does

not indicate any legal basis for dismissal under any rule proscribed by this Commonwealth. The motion is essentially a ranting dissertation alleging bias, prejudice, and ill-will towards the Defendant. Because there is no legal basis for which relief can be granted, this first motion to dismiss is hereby **DENIED**.

The Defendant's December 8th motion to dismiss was filed pursuant to Pa.R.Crim.P. 600, alleging that the time to bring the instant case to trial has expired. The Defendant states the following with regard to his motion: "When an appellate court has remanded a case to the trial court if the defendant is incarcerated on that case trial shall commence within 120 days after that [] date of remand." This Court believes the Defendant is referring to Pa.R.Crim.P. 600(B)(5), which states the following: Except in cases in which the defendant is not entitled to release on bail as provided by law, no defendant shall be held in pretrial incarceration in excess of 120 days from the date of the written notice from the appellate court to the parties that the record was remanded. Importantly, this case was not remanded for a new trial. The Superior Court previously affirmed the Defendant's sentence in their Order dated June 22, 2021. Therefore, the Defendant is **not** in pretrial incarceration, but he is instead serving his sentence, which was affirmed on appeal. We therefore **DENY** the Defendant's second motion to dismiss.

Finally, the Defendant's December 19th motion to dismiss was additionally filed pursuant to Pa.R.Crim.P. 600. The Defendant again cites to Pa.R.Crim.P.

600(B)(5)'s 120-day time frame. For the reasons stated above, we will also **DENY** this third motion to dismiss.

## VI. Defendant's "Motion of Awareness"

As indicated *supra*, the Defendant filed a "Motion of Awareness" on December 19, 2023. This Court is unaware of what a "Motion of Awareness" is and does not find a legal basis for this motion. However, the Defendant seems to be requesting information as to whom Attorney Brandy Hoke represented in the instant case in response to an Order Granting Payment of Counsel Fees filed by this Court on December 11, 2023. Attorney Hoke was appointed to represent the Defendant, Joseph Francesco Bent, for the purposes of PCRA. While the Defendant did not wish to have counsel represent him, and while Attorney Hoke was permitted to withdraw from the case, Attorney Hoke *did* complete 2.7 hours of work, despite the Defendant refusing to cooperate with her representation, and is *entitled* to payment for that work completed. We therefore **DISMISS WITH PREJUDICE** the Defendant's Motion.

BY THE COURT,

Date: 2/1/24

_____
KATHLEEN J. PRENDERGAST,
JUDGE

30